IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JULIAN BETANCOURT, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 10 C 4763 |
| | ) ) ) | Ronald A. Guzman District Judge |
| v. | ) ) | Jeffrey T. Gilbert Magistrate Judge |
| MAXIM HEALTHCARE SERVICES, INC., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Julian Betancourt, on behalf of himself and all other individuals similarly situated, filed this lawsuit against defendant Maxim Healthcare Services, Inc. alleging that defendant misclassifies staffing recruiters employed by its Staffing Solutions division as exempt from overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. This matter is before the Court on plaintiff's motion for notice to potential class members [Dkt.#32] pursuant to section 216(b) of the FLSA. Plaintiff also asks the Court to approve the form and content of his proposed notice to the class. For the reasons set forth in this Memorandum Opinion and Order, plaintiff's motion for notice to potential class members is granted.

## BACKGROUND[1]

Plaintiff Julian Betancourt worked as a staffing recruiter for defendant Maxim Healthcare Services Inc.'s Staffing Solutions division ("Maxim Staffing") in offices located in Des Plaines, Illinois and Bingham Farms, Michigan.  (Betancourt Declaration ("Decl."), Pl's Ex. 1, at ¶2).  He was hired as a staffing recruiter in November 2007 and promoted to senior staffing recruiter in or about January 2009.  (*Id.;* Betancourt Dep., Def's Ex. B1, at 108-109).  Betancourt left defendant's employ in October 2009.  (Pl's Ex. 1, at ¶2).

Defendant's Maxim Staffing division specializes in providing healthcare and administrative personnel to hospitals, nursing homes, clinics, and other facilities on a "per diem" contract basis and/or on a direct hire basis.  (Def's Resp. Br., at 1-2).  Maxim Staffing is divided into 12 subdivisions and has approximately 124 offices nationwide.  (Lamon Decl., Def's Ex. A1, at ¶¶3, 5). There are approximately 60 additional "hybrid" offices that house some Maxim Staffing recruiters but primarily support Maxim's Homecare division.  (*Id.* at ¶3).

Plaintiff is joined by 14 other "opt-in" plaintiffs who also worked for defendant as Recruiters.[2]  (Pl's Reply Br., at 1).  Plaintiff and the opt-in plaintiffs collectively worked in at least 13 states and numerous field offices.[3]  (Pl's Reply Br., at 1).  Plaintiff and the opt-in plaintiffs, as well as other potential members of the proposed class, either work or have worked under the same job title and job description as Recruiters.  A uniform job description for a

---

[1] To the extent that anything in this Background section can be interpreted as a factual finding, such a finding is necessarily preliminary for the reasons set forth in the next section on the legal standard employed in this early conditional certification phase of an FLSA section 216(b) collective action.

[2] The term "Recruiter" as used herein means both a staffing recruiter and a senior staffing recruiter unless otherwise stated.

[3] It is not always possible from the opt-in consents that have been filed to date, or from the declarations of certain opt-in plaintiffs submitted in support of the instant motion, to know where the opt-in plaintiff lives or was employed.

Recruiter is used by defendant nationwide, and it lists five "core responsibilities" described as follows:

**Healthcare Recruiter Core Responsibilities include:**

- **Support and sustain Maxim's commitment to compliance**
    - Maintain awareness and understanding of compliance – Maxim business policies and Code of Conduct, Federal/State Regulations, and contract-specific requirements
    - Participate in core compliance training and activities
    - Identify and communicate areas of risk and potential improvement opportunities

- **Recruit potential caregivers**
    - Locate Healthcare professionals through various sources, including the Internet, referrals, nursing schools, direct mail and job fairs
    - Facilitate the hiring process, which includes interviewing and screening candidates
    - Demonstrate the ability to guide a candidate through Maxim's hiring process
    - Present qualified candidates to clients

- **Assist in the Sales Process**
    - Manage healthcare professionals and place them on top medical assignments
    - Consult with clients to provide appropriate staffing solutions
    - Identify and/or resolve client customer service issues
    - Provide 24 hour support to our clients
    - Analyze financial reports and edit weekly payroll
    - Assist Accounts Manager in prospecting new business

- **Communicate effectively**
    - Maintain direct communication with candidates, clients, and team members during the recruiting process
    - Resolve client customer service issues

- **Perform all other duties as assigned**

(Pl's Reply Br., Ex. 1) (emphasis in original).

Plaintiff claims that each Recruiter performs essentially the same core job duties. Plaintiff and four opt-in plaintiffs submitted declarations in support of this motion and state in those declarations that Recruiters perform six primary core duties: "(1) assist in the placement process for nurses by screening potential nursing candidates regarding their minimum qualifications and fitness for employment in accordance with the standards set forth by Maxim and my superiors, (2) recruit potential candidates from various internet sites and cold calls, (3) answer the phone, (4) input payroll hours for billing purposes, (5) assist in scheduling the nurses, and (6) occasionally meeting with facilities who require nurses." (Pl's Exs. 1-5, each at ¶3).

Plaintiff and the opt-in plaintiffs state that they regularly worked more than 40 hours per week (Pl's Exs. 1-5, each at ¶5) and that they were paid a salary, but not any overtime compensation (*Id.* at ¶¶5, 6). Each says that he or she did not have the discretion, ability or judgment as part of his or her job to make decisions concerning hiring, firing, job performance, discipline or specific job duties, nor did they have the authority to negotiate the terms of placement or the fees that would be paid to defendant for the recruiting functions they undertook. (*Id.* at ¶4). Rather, they say that these matters were "decided in accordance with strict, well-established company policies, standards and criteria." (*Id.*). Finally, plaintiffs state that they got to know other Recruiters and became familiar with their job responsibilities when they worked for defendant and that those other Recruiters worked under the same common set of practices and procedures. (*Id.* at ¶7).

Defendant disputes that all Recruiters perform the same common, core job duties. Defendant says that each Maxim Staffing office is run independently and that Recruiters' job duties vary from office to office. (*See, e.g.*, Lamon Decl., Def's Ex. A1, at ¶¶6, 7). According to defendant, the duties and responsibilities of a Recruiter for its Maxim Staffing division vary

widely and in a myriad of nuanced ways depending upon the office and the particular

subdivision in which the Recruiter works.  (Def's Resp. Br., at 5; s*ee also* Lamon Decl., Def's

Ex. A1, at ¶¶6, 7, 9).  These variations according to defendant relate to, among other things, a

Recruiter's authority to evaluate and hire candidates, negotiate wage rates, discipline, schedule,

place, train, counsel or coach employees, supervise other recruiters, promote sales activities, the

frequency and extent of on-call work, and the amount of supervision a Recruiter receives from an

Account Manager.  (*See generally* Def's Resp. Br., at 5-11, and Exhibits cited therein).

Defendant submitted 23 affidavits from current employees ranging from the president of

Maxim Staffing, Pat Lamon, to people who are or were staffing recruiters, senior staffing

recruiters, account managers, and others attesting to the variety of different ways in which

Recruiters do their jobs.  In their declarations, defendant's current employees, in some detail,

attest to how they approach their jobs and how they perform them with reference to a number of

tasks including hiring and firing external employees, negotiating wage rates, training and

supervising others, promoting sales activities, and working nights and weekends.

Defendant argues that plaintiff and the opt-in plaintiffs that have joined him thus far

represent only a very small number of the total number of Recruiters nationwide who comprise

the proposed opt-in class.  Defendant contends that the job experiences of plaintiff and the opt-in

plaintiffs are not typical of the range of experiences for its Recruiters across multiple offices.

Therefore, defendant argues the Court should not certify a conditional class under the FLSA

since the ultimate determination required in this case—whether Recruiters are exempt from

FLSA overtime pay requirements—as well as the issue now before the Court—whether plaintiff

and the proposed class are similarly situated for purposes of section 216(b) conditional

certification—require focused and individualized inquiries that are inappropriate for class treatment.

Defendant does not seem to dispute that Recruiters regularly work more than 40 hours a week and that many Recruiters are "on-call" some nights during the week and on weekends.[4] Defendant also does not dispute that it does not pay Recruiters for overtime work (*i.e.*, more than 40 hours worked per week).  Rather, defendant categorizes all Recruiters as administratively exempt employees and pays them a salary.  (Lamon Decl., Def's Ex. A1, at ¶14).  Recruiters also are eligible for and paid bonuses under certain circumstances. (*See, e.g., Id.* at ¶15 ("Staffing Recruiters in an office split 2% of the office spread. . . . Staffing Recruiters are also eligible to participate in certain sales contests.")).  Defendant maintains it properly classifies its Recruiters as exempt from any overtime pay requirement.  Employers do not have to pay overtime to individual employees "employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  Plaintiff disagrees that Recruiters are exempt employees under the FLSA.

Plaintiff proposes that the Court conditionally certify and authorize that notice be sent to the following class: "All current and former salaried staffing recruiters who have been employed at any time by Defendant Maxim Healthcare Services, Inc. (excluding California) during the time period July 29, 2007 to Present."[5]  The parties have submitted extensive briefing on the

---

[4] Affidavits submitted by both plaintiff and defendant demonstrate a pattern of Recruiters working more than 40 hours per week and being "on-call" on weekday nights and weekends. (*See* Def's Exs. A1-A8, A10, A13, A14, A16-A23; Pl's Exs. 1-5).

[5] Plaintiff's proposed class includes both entry level staffing recruiters and senior staffing recruiters. Plaintiff testified in his deposition that his "duties did not change at all" when he became a senior recruiter a little more than a year after he was hired.  (Betancourt Dep., Pl's Ex. 1, at 109).  Some of defendant's employees say that senior recruiters have supervisory responsibility for newer recruiters. (Carr Decl., Def's Ex. A4, at ¶26).  Other employees state they gained additional responsibilities when they became senior staffing recruiters, such as mentoring or training new recruiters (Larson Decl., Def's

merits of this motion.  Limited oral argument was held on this matter on April 14, 2001, and this matter is ripe for decision.

## LEGAL STANDARD

Under section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other "similarly situated" employees against employers who allegedly violate the overtime provisions of the FLSA.  29 U.S.C. § 216(b).  District courts have discretion in managing collective actions because the FLSA does not detail specific procedures for certifying a conditional class or authorizing collective action notices.  *Hoffmann-La Roche, Inc. v. Sperling,* 493 U.S. 165, 170-174 (1989).  The standards and procedures provided by Federal Rule of Civil Procedure 23 are inapplicable here because the FLSA uses an "opt in" rather than an "opt out" system.  *Olmstead v. Residential Plus Mortg. Corp.*, 2008 WL 5157973, at *2 (N.D. Ill. Dec. 9, 2008); *Jirak v. Abbot Laboratories, Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008); *King v. General Elec. Co.,* 960 F.2d 617, 619 (7th Cir. 1992).  Although the Seventh Circuit has not addressed how a district court should manage collective actions, "the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Jirak,* 566 F. Supp. 2d at 847.

In the first stage, a court grants "conditional certification" of the collective action and authorizes notice to other potential claimants if the plaintiffs can show they are similarly situated to those potential claimants.  *Russell v. Ill. Bell Tel. Co.*, 575 F. Supp. 2d 930, 933 (N.D. Ill. 2008).  In order for a class to be conditionally certified, plaintiff only needs to make a "modest

---

Ex. A14, at ¶21; McIntosh Decl., Def's Ex. A15, at ¶19; Toegel Decl., Def's Ex. A23, at ¶21) or preparing financial and operational reports (McIntosh Decl., Def's Ex. A15, , at ¶15; Powell Decl., Def's Ex. A17, at ¶24; Rogers Decl., Def's Ex. A20, at ¶23). Others do not mention that their duties or responsibilities changed when they progressed from being a staffing recruiter to a senior staffing recruiter. (Cardona Decl., Def's Ex. A3, at ¶1; Suarez Decl., Def's Ex. A22, at ¶20 ("My day-to-day duties did not change very much when I became a Senior Staffing Recruiter. However, I have participated in developing the Miami Office's business plan.")).

factual showing sufficient to demonstrate that [he] and potential class members were victims of a common policy or plan that violated the law." *Witteman v. Wisconsin Bell Inc.,* 2010 WL 446033, at *2 (W.D. Wis. Feb. 2, 2010): *See also Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003); *Russell,* 575 F. Supp. 2d at 937; *Vazquez v. Tristate Management Company, Inc.*, 2002 WL 58718 (N.D. Ill. April 29, 2002).

While the Seventh Circuit has yet to define precisely the contours of the "similarly situated" standard, most courts employ a lenient interpretation.  *Jirak,* 566 F. Supp. 2d at 848. "The burden in this preliminary certification is light because the risk of error is insignificant: should further discovery reveal that the named positions, or corresponding claims, are not substantially similar the defendants will challenge the certification." *Craig v. Rite Aid Corp.*, 2009 WL 4723286, at *2 (M.D. Pa. Dec. 9, 2009); *see also Witteman*, 2010 WL 446033, at *1 ("[A]pproval simply allows plaintiffs to provide notice to other potential class members so that they may make an informed decision whether to join the case.").  One court noted that a conditional class may be certified if plaintiff makes the "modest showing" required by law even if "[t]he majority of defendants' arguments may indeed support eventual 'decertification' at the second stage." *Bastian v. Apartment Investment and Management Co.*, 2007 WL 5234235, at *1 (N.D. Ill. Sept. 17, 2007).

On the other hand, denying conditional certification may prevent some plaintiffs from being able to pursue their claims due to the expense of litigation.  *See Russell v. Illinois Bell Telephone Co.,* Inc., 721 F. Supp. 2d 804, 823 (N.D. Ill. 2010) ("Because of the modest amounts likely involved, many of the plaintiffs would be unable to afford the costs of pursuing their claims individually.").  Since the standard is lenient, "it typically results in conditional certification of a representative class." *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d

988, 990 (N.D. Ill. 2010).  Further, a court has other means available to it to monitor litigation

and ensure that it is not unnecessarily prolonged and expensive without stopping a case from

proceeding as a collective action prematurely in its infancy.  *See* FED. R. CIV. P. 16 and 26(f);

*see also Bastian*, 2007 WL 5234235, at *1 ("Should defendants' warnings ultimately prove to be

correct, and this litigation is ultimately found to have been unnecessarily prolonged and costly,

appropriate sanctions maybe sought under FED. R. CIV. P. 11 and 28 U.S.C. § 1927.").  Of

course, class certification can benefit a defendant, too, insofar as a defendant that succeeds on the

merits of a class claim then forecloses its potential liability to an entire class of current and/or

former employees rather than to just one plaintiff.

The Court's "determination [as to whether a collective action may be appropriate] at this

initial phase of inquiry does not involve adjudication of the merits of the claims."  *Brabazon v.

Aurora Health Care, Inc.,* 2011 WL 1131097*3 (E.D. Wis. March 28, 2011).  "Rather, the

named plaintiff 'must demonstrate only that there is some factual nexus that connects [him] to

other potential plaintiffs as victims of an unlawful practice.'"  (*Id.*) (citations omitted).  In the

second stage, following the opt-in process and after discovery, defendant may "move to decertify

the case or divide the class into subclasses." *Kenton Smallwood v. Illinois Bell*, 710 F. Supp. 2d

746, 753 (N.D. Ill. 2010) (citing *Carnegie v. Household International, Inc.,* 376 F.3d 656, 661

(7th Cir. 2004)).  The second stage does not begin, however, "until potential plaintiffs have been

given a chance to 'opt-in' to the collective action and discovery is complete." *Persin v. Career

Builder, LLC,* 2005 WL 3159684, at *1 (N.D. Ill. Nov. 23, 2005). The court must then reexamine

the class "to determine whether there is sufficient similarity between the named and opt-in

plaintiffs to allow the matter to proceed to trial on a collective basis." *Id.*

**DISCUSSION**

This matter is before the Court on plaintiff's motion for notice to potential class members – essentially a motion for certification of a conditional class in a section 216(b) collective action. Plaintiff seeks conditional certification solely for the purpose of sending notice to potential class members. Therefore, at this time, this Court is only concerned with whether plaintiff and the proposed class are similarly situated with respect to a common policy or plan established by defendant that allegedly violates the law.

Even under this lenient standard, however, the factual showing required to meet the similarly situated standard is not a "mere formality." *Campbell v. Advantage Sales & Mktg., LLC*, 2010 WL 3326752, at *4 (S.D. Ind. Aug. 24, 2010). Accordingly, the Court will analyze whether plaintiff has met his burden of demonstrating as a preliminary matter, and without prejudice to further proceedings on this issue, that defendant has established and implemented a common policy or plan that potentially violates the law and whether plaintiff and the proposed class are "similarly situated" with respect to that common policy or plan. In the course of this analysis, the Court will address defendant's argument that the differences between the way Recruiters do their jobs across the company would require a highly individualized, case-by-case analysis to determine whether plaintiff and the proposed class members are similarly situated and whether Recruiters are exempt under the FLSA, rendering this case inappropriate for conditional certification under section 216(b) of the FLSA.

I.      **Plaintiff Has Shown That Defendant Has a Common Policy or Plan**

Plaintiff contends that defendant has a common plan or policy not to pay Recruiters overtime for hours worked over 40 hours during the week and on the weekends. In each of plaintiffs' five declarations, the affiants claim that defendant regularly required Recruiters to

work more than 40 hours per week and defendant knew they did so.  (Pl's Exs. 1-5, at ¶5).

Defendant's affidavits of current employees also indicate that many Recruiters work more than

40 hours per week without overtime pay.  (*See* Def's Exs. A2-A8, A10, A13, A14, A16-A23).

Plaintiff also has submitted evidence showing that defendant uses a common job description for

its Recruiters across the country, regardless of the particular office or subdivision in which the

Recruiter works, and that Recruiters are responsible for a common, core set of duties.  (Pl's

Reply Br., Ex. 1; Pl's Exs. 1-5, each at ¶3).  Finally, it is not disputed that defendant uniformly

classifies Recruiters as exempt employees regardless of any potential differences in their day-to-

day job duties.

     Defendant argues that the existence of the common policy or plan alleged by plaintiff

depends upon the assumption that the Recruiter position does not fit within the administrative

exemption under 29 U.S.C. § 213(a)(1) (and its implementing regulations at 29 C.F.R. §

541.200, *et seq.*).  Defendant contends that such misclassification claims are not susceptible to

class treatment because they necessarily require individualized inquiry into whether employees

exercise discretion and independent judgment.

     Most of the cases defendant cites to support its argument, however, were decided in a

different context or at a much different stage in the litigation than the instant case, typically after

more discovery had occurred and even after a full trial on the merits.  *See, e.g., Hudkins v.*

*Maxim Healthcare Servs., Inc.,* 39 F. Supp. 2d 1349 (M.D. Fla. 1998), *aff'd*, 176 F.3d 493 (11th

Cir. 1999) (after a bench trial on liability); *Bunyan v. Spectrum Brands, Inc.,* 2008 WL 2959932,

at *3 (S.D. Ill. July 31, 2008) ("over fifteen months of discovery has taken place"); *O'Donnell v.*

*Robert Half Int'l, Inc.,* 429 F. Supp. 2d 246, 250, 252-253 (D. Mass. 2006) (plaintiffs were two

former staffing managers who worked in one office in a single division of the defendant and

discovery including motions to compel discovery had taken place); *Andrade v. Aerotek,* 2009 WL 2757099, at *4, n.11 (D. Md. Aug. 26, 2009) (no distinction in proposed class between recruiter trainees, recruiters and account managers, and parties were briefing summary judgment motion on the applicability of the administrative exemption); *Lusardi v. Xerox Corp.,* 118 F.R.D. 351 (D.N.J. 1987) (some discovery had taken place and one class notice already had been sent out).

Plaintiff, on the other hand, cites a number of cases in which courts have conditionally certified a class in misclassification cases early in the litigation and in the context of the first stage inquiry under section 216(b) of the FLSA described above.  These courts view the argument that a defendant is protected by the administrative exemption as more properly decided as part of the second stage analysis in a section 216(b) conditional class certification case upon a more developed factual record.  *See, e.g.,Wlotkowski v. Michigan Bell Telephone Co.*, 267 F.R.D. 213 (E.D. Mich. 2010); *Witteman*, 2010 WL 446033, at *2-3; *Jirak*, 566 F. Supp. 2d at 850; *see also, Petersen v. Marsh USA, Inc.* 2010 WL 5423734, at *5 (N.D. Ill. Dec. 23, 2010) (holding that "[t]he rigorous comparison of day-to-day job responsibilities urged by defendants is inappropriate at the conditional certification stage").

We agree with plaintiff's reading of the applicable case law.  Taken together, plaintiff's evidence is sufficient as a threshold matter to show that defendant has established a common policy or plan with respect to its Recruiters.  In *Russell,* the court granted conditional class certification based solely upon the affidavits of employees, all of which made substantially the same allegation: that the company required employees to perform unpaid work.  575 F. Supp. 2d at 934.  Although some courts have engaged in a more rigorous analysis of the merits of an FLSA plaintiff's purported class claims at an early stage of the litigation, it makes more sense in

this case to decide whether the proposed class should be fine-tuned or even should be decertified, and whether defendant's policy of not paying overtime compensation to Recruiters is lawful under the FLSA's administrative exemption, after both sides have had the opportunity to take discovery and develop the factual record.

Defendant's argument that plaintiff and the proposed class are not similarly situated with respect to how they actually perform their jobs and the issue of whether defendant properly classifies all or some of its Recruiters as exempt employees are more appropriately decided on a more developed factual record.  Right now, all we have are affidavits from some plaintiffs and defendant's current employees containing statements that have not been subjected to the adversary process.  The weight we give those affidavits has to be tempered by that consideration. *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1060 (N.D. Cal. 2007) (recognizing "glaring reliability concerns" in both the "cookie cutter" declarations produced by a plaintiff and the potentially selective affidavits from defendant's employee's that "carry within them possible pressure arising from ongoing employment relationships").  Further, it is not our job at the first stage of the FLSA conditional certification inquiry to decide contested issues of fact.  *Brabazon v. Aurora Health Care, Inc.,* 2011 WL 1131097, at *3;  *In re: Enterprise Rent-A-Car Wage & Hour Employment Practices Litig. v. Enterprise Rent-A-Car Co., et al.,* 2010 WL 3447783, at *21 (W.D. Pa. Aug. 13, 2010) (quoting *Summa v. Hofstra Univ.*, 2008 WL 3852160, at *2 (E.D.N.Y. Aug. 14, 2008)); *Bamgbose v. Delta-T Group, Inc.,* 2010 WL 431711, at *5 (E.D. Pa. Feb. 8, 2010) ("The court does not make any credibility determinations or findings of fact when presented with contrary evidence.").

Defendant will have an opportunity to make all of the arguments it is making now at the second stage of the FLSA class certification process.  It can argue that the class should be

decertified or that subclasses are necessary because of variations in the job duties and responsibilities of Recruiters.  Defendant already has foreshadowed some of its arguments in that regard.  It contends that Recruiters who work in particularly large or small offices, in hybrid offices, or who have been with the company for a longer period of time are in different categories than other Recruiters.  Defendant also will have an opportunity to argue that the way it pays Recruiters in its Maxim Staffing division is perfectly lawful.  And, equally important, plaintiffs will have an opportunity to rebut all of those arguments, if they can, after they have had a chance to take discovery from defendant and its employees and develop the evidence and arguments plaintiffs need to make their case.

Further, as discussed more fully below, defendant's affidavits raise more questions than they answer definitively.  They show that Recruiters do a variety of things in the course of their employment but do not conclusively establish that Recruiters are covered by the administrative exemption for employees who exercise substantial discretion and independent judgment in their jobs.  Therefore, even if it were our intention to resolve this issue at this stage of the proceedings, we cannot and would not do so solely on the basis of defendant's affidavits.  Again, this is an issue to be decided upon a more complete factual record than we have before us now.  See section II, *infra*.

Accordingly, for present purposes, we find that plaintiff has shown that defendant has a company-wide policy or plan of not paying overtime compensation to Recruiters in its Maxim Staffing division who perform the core job duties contained in the company's Recruiter job description, and that this policy or plan may be in violation of the law.

## II.     Plaintiff Has Demonstrated That He and the Proposed Class Are Similarly Situated

Plaintiff next argues that he and the proposed class are similarly situated with respect to defendant's common policy or plan not to pay overtime to its Recruiters.  Plaintiff has submitted five sworn declarations from himself and other Maxim Staffing Recruiters who worked in seven different offices.  Each affidavit says that he or she performed the same general core duties on a regular basis and worked similar hours.  (Pl's Exs. 1-5).  Plaintiff also provided evidence that all Recruiters share a common job title and job description.  (Pl's Reply Br., Ex. 1).  Lastly, plaintiff provided lists of training courses available to him and two of the opt-in plaintiffs that tend to show Recruiters receive the same training across offices.  (Pl's Reply Br., Ex. 3).

Defendant argues that plaintiff and the opt-in plaintiffs who have come forward so far are not similarly situated to the thousands of current and former Maxim Staffing Recruiters because plaintiffs represent only a small percentage of the members of that potential class.  Defendant submitted 23 employee declarations in opposition to plaintiff's motion for notice to potential class members and argues that these affidavits show that Recruiters perform their jobs in a myriad of different ways in over 100 Maxim Staffing offices around the country and that the Court would have to inquire into these differences to resolve whether plaintiff and the proposed class are similarly situated.  We disagree.  Defendant's suggestion that the Court must conduct a searching, fact-intensive inquiry of exactly what each Recruiter does on a daily basis to decide the "similarly situated" issue and would require more than is necessary at this time to determine whether plaintiff has made the showing necessary under the lenient first stage inquiry of conditional class certification under the FLSA.

Plaintiff need not show that potential class members performed identical duties to meet the test at the first stage of the conditional certification analysis.  *Olmsted v. Residential Plus*

*Mortg. Corp.*, 2008 WL 5157973, at *3 (N.D. Ill. Dec. 9, 2008) ("Plaintiff need not show that potential class members performed identical duties to meet this standard, and conditional certification may be appropriate even if differences exist between their job titles, functions, or pay."). The court in *Smallwood v. Illinois Bell Telephone Company*, 710 F. Supp. 2d 746 (N.D. Ill. 2010), for example, granted conditional certification based upon 43 declarations provided by opt-in plaintiffs which demonstrated "overlapping essential job duties and similar training amongst OSP Engineers." 710 F. Supp. 2d at 751. The court overlooked potential differences between individual putative class members raised by the defendant because they are not "appropriately considered at the conditional certification stage of the proceedings." *Id.*

Plaintiff in this case does not provide as many declarations as did the plaintiff in *Smallwood*. Each of the affidavits submitted by plaintiff in this case, however, states that Recruiters performed the same essential duties: (1) assist in the placement process for nurses, (2) recruit potential candidates, (3) answer the phone, (4) input payroll hours, (5) assist in scheduling the nurses, and (6) meet with facilities who require nurses. (Pl's Exs. 1-5, at ¶3). Furthermore, defendant's affidavits from its current employees do not, on their face, show conclusively that it is impossible or even imprudent to certify a class of similarly situated Recruiters as the courts have construed and applied the term "similarly situated." To the contrary, defendant's affidavits seem to show that Recruiters throughout the company generally perform many of the same tasks, though arguably in various ways along a spectrum, taking into account the size of the office in which they work, the division in which they work, and other objective criteria. On the present record, however, and without making critical credibility and factual determinations, it is impossible to make the kind of distinctions and draw the legal and factual conclusions defendant urges the Court to draw from its employees' affidavits.

Although defendant's employees describe how they perform their jobs using different language and with some different emphasis than plaintiff and some of the opt-in plaintiffs, we do not know now whether these differences are material in the context of a collective action or whether they can be accommodated adequately with subclasses.  Without the development of a fuller record, for example, it is difficult to say whether Recruiters who say they negotiated pay rates within a range calculated as a percentage of the bill rate (Cardona Decl., Def's Ex. A3, at ¶15), negotiated pay rates with no other limitations other than the state's minimum wage rate (Carr Decl., Def's Ex. A4, at ¶19), and negotiated pay rates within a range of $2 (Connolly Decl., Def's Ex. A5, at ¶15), are doing essentially the same thing or very different things.  Plaintiff and his opt-in cohorts say that any negotiation of pay rates is done "in accordance with strict, well-established company policies, standards and criteria." (Pl's Exs. 1-5, each at ¶4).  Does the ability to negotiate wage rates within some parameters or not at all mean the Recruiters are not similarly situated for purposes of the first stage of the conditional certification analysis or is that just a factor to be taken into consideration at the second stage?

In the same vein, it is difficult to determine whether Recruiters who say they discipline outside employees are similarly situated to Recruiters who say they do not do so at this threshold stage.  Defendant's employees say they make suggestions for better performance (Toegel Decl., Def's Ex. A23, at ¶14), give verbal warnings (Rayburg Decl., Def's Ex. A19, at ¶17), formally document external employees' behavior (Carr Decl., Def's Ex. A4, at ¶22), and actually penalize them (Larson Decl., Def's Ex. A14, at ¶16).  Some employees say the discipline they mete out is on the Recruiter's sole authority; others say it is in conjunction with a supervising account manager.  (*Compare* Carr Decl., Def's Ex. A4, at ¶22, *with* Suarez Decl., Def's Ex. A22, at ¶18 ("I do not terminate employees but I do inform employees that they are no longer wanted at a

client's facility.") *and* Ruff Decl., Def's Ex. A21, at ¶16 ("I was responsible for counseling, disciplining, and terminating external employees.")).  Again, plaintiff and his opt-in cohorts imply that if they do discipline employees, that is "handled by upper management, including the Account Manager," and done "in accordance with strict, well-established company policies, standards and criteria."  (Pl's Exs. 1-5, each at ¶ 4).  Likewise, whatever impact this may have on the ultimate determination of whether Recruiters are exempt from the overtime compensation requirement of the FLSA cannot be decided right now.

This same issue recently was decided by the court in *Witteman v. Wisconsin Bell, Inc.,* 2010 WL 446033 (W.D. Wis. Feb. 2, 2010), which involved facts similar to the present case. The court in *Witteman* found that "[d]efendant's arguments about the predominance of individualized inquiries and the dissimilarities between plaintiff and other employees are [only] properly raised after the parties have conducted discovery."  2010 WL 446033, at *2.  Similarly, in *Gambo v. Lucent Technologies, Inc*., the court granted conditional class certification even though it recognized that the individualized nature of the inquiries may ultimately "prove to be sufficiently unwieldy or cumbersome that a collective action will not be appropriate in some or any form." 2005 WL 3542485, at *6 (N.D. Ill. Dec. 22, 2005) (finding that risk of an individualized inquiry "does not, under relevant case law, mean that notice may not fairly issue under the more lenient step one FLSA analysis").

Additionally, all Maxim Staffing Recruiters share a common job title and job description. (Pl's Reply Br., Ex. 1).  Although defendant correctly points out that a plaintiff's job title alone is insufficient to establish whether an employee is exempt or non-exempt, defendant pushes that argument too far in arguing that "it is irrelevant that plaintiffs share a common job title and job description." (Def's Reply Br., at 1).  It is not irrelevant.  But neither is it dispositive.  Courts

frequently look to job descriptions as evidence that employees held similar positions and performed similar duties. *See Smallwood*, 710 F. Supp. at 749; *Justin Bell v. Citizen Financial*, 2010 WL 3463300, at *1 (W.D. Pa. Sept. 2, 2010).

Further, in this case, plaintiff and defendant do not differ materially in their views of what Recruiters do on a daily basis.  For example, defendant's uniform job description for its Recruiters (Pl's Reply Br., Ex. 1) seems to summarize, in a general way, the same kinds of job responsibilities and duties that defendant says its Recruiters perform across its Maxim Staffing division, as further explained in the 23 affidavits submitted by defendant's employees.   Plaintiff and defendant apparently agree that defendant's Recruiters "assist in the sales process," "manage healthcare professionals," "consult with clients," and "resolve client customer service issues." (Pl's Reply Br., Ex. 1).  Although these are quotes are taken from defendant's uniform Recruiter job description submitted by plaintiff in support of conditional class certification (*id.*), the job duties described in the uniform description evoke the same kinds of tasks that defendant's employees say they perform on a daily basis.

For example, with respect to "assist[ing] in the sales process," one of the job duties in the Recruiter job description submitted by plaintiff, defendant's affiant Cardona states: "[A]s both a Staffing Recruiter and a Senior Staffing Recruiter, I performed sales development activities. . . . I sometimes went on sales calls with my Account Manager if he set up the meeting." (Cardona Decl., Def's Ex. A3, at ¶22; *see also* Def's Exs. A6, at ¶21; A9, at ¶13; A10, at ¶24; A12, at ¶11; A23, at ¶18; A16, at ¶15).  With respect to "manag[ing] healthcare professionals," defendant's affiant Raborn says: "After I placed employees, I basically acted as their manager."  (Raborn Decl., Def's Ex. A18, at ¶14; s*ee also* Def's Ex. A4, at ¶22).  With respect to "resolv[ing] customer service issues," defendant's affiant Carr states: "I also handle complaints from clients

about external employees." (Carr Decl., Def's Ex. A4, at ¶24). And defendant's affiant Neu says: "When a client files an incident report, I talk to both the client and the employee, listen to both sides, and try to find creative ways to resolve the problem." (Neu Decl., Def's Ex. A16, at ¶13; *see also* Def's Exs. A12, at ¶8; A17, at ¶16; A18, at ¶15.) Lastly, with respect to the amorphous notion of "consult[ing] with clients," defendant's current employees state that they consult with defendant's clients every day of the week. (*See* Def's Exs. A5, at ¶19; A19, at ¶24; A20, at ¶24; A23, at ¶17).

Defendant seems to want to make two points with its 23 employee affidavits: that plaintiff and the opt-in plaintiffs are not similarly situated vis-à-vis the proposed class of Recruiters, and that its Recruiters exercise discretion and independent judgment so that they are administratively exempt from overtime pay requirements. As discussed above, however, whether or not defendant's Recruiters are administratively exempt is not a determination we are prepared to make at this stage of the process. Regardless, plaintiff is not using the job title or uniform job description to show that the potential class members are not exempt employees. Rather, plaintiff is using it as evidence that he and the proposed class are similarly situated. On that point, defendant's affidavits seem to show the same thing—that Recruiters tend to perform similar tasks within a spectrum of job duties and responsibilities, many of which correspond to the general duties described in the uniform job description. Therefore, we agree for present purposes that the uniform job description on which plaintiff relies and the gist of many of defendant's own employee affidavits establish that plaintiff and the proposed class of Recruiters are similarly situated at stage one of the conditional class certification analysis.

We recognize that this is not the conclusion defendant wishes that the Court draw from its 23 employee affidavits. It is, however, the conclusion we reach after reviewing them in light

of the uniform Recruiter job description referenced by plaintiff.  It may be that we will agree with defendant at the second stage of the analysis that there are too many variations between the day-to-day duties of Recruiters located in different offices and sub-divisions to resolve the issues raised by plaintiff here in a collective action.  On the other hand, it may be possible to create effective subclasses of employees that perform sufficiently similar duties so that this action can be decided on a collective basis.  Further, it may be that defendant is right to classify its Recruiters as exempt employees given what it expects of them and what they do on a daily basis. Again, however, these are decisions best made on a more fully developed record than we have before us now.  *Cf. Petersen v. Marsh USA, Inc.* 2010 WL 5423734, at *5 (N.D. Ill. Dec. 23, 2010) ("The question is not whether the case should go to trial as a collective action, but whether other employees who are similarly situated should be advised the case is pending so they can decide whether to join it.").

Finally, plaintiff also provides evidence of a uniform training program for defendant's Recruiters regardless of where they are located.  (Pl's Reply Br., Ex. 3).  The uniform training program serves as evidence that the duties of the Recruiter position are defined, at least at some level, by comprehensive corporate practices and procedures.  In *Vinole v. Countrywide Home Loans, Inc.*, the Ninth Circuit ruled in favor of class certification based upon evidence of standardized corporate policies and procedures governing employees such as uniform training programs.  571 F.3d 935, 946 (9th Cir. 2009).  "Where. . . there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities." *Id.* (quoting *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 160 (S.D. NY 2008)).

21

For all of these reasons, we find that plaintiff has made the modest factual showing required at this stage in the litigation to demonstrate that he and the potential opt-in plaintiffs are similarly situated with respect to a common policy or plan that allegedly violates the FLSA.

**III.     Plaintiff Is Not Required to Make a Heightened Evidentiary Showing at this Time**

Defendant argues, however, that this Court should require plaintiff to make a heightened evidentiary showing because some discovery has taken place.  When substantial discovery has been conducted, some courts have applied an intermediate standard of review at stage one of the FLSA class certification analysis.  *See*, *e.g., Bunyan v. Spectrum Brands, Inc.,* 2008 WL 2959932, at *4-5 (S.D. Ill. July 31, 2008) ("In cases such as this one, where substantial but not all discovery has taken place, the intermediate two-step approach seems particularly appropriate.").  In *Bunyan*, the parties had conducted nearly 10 months of discovery including interrogatories, depositions, and the exchange of a large number of documents.  *Id.* at 4; *see also Villanueva-Bazaldua v. TruGreen Ltd. Partners*, 479 F. Supp. 2d 411, 415 (D.Del. 2007) ("District courts in other circuits have adopted an intermediate approach to the 'similarly situated' inquiry when the parties voluntarily engage in discovery prior to a decision on conditional certification."); *Thiessen v. General Elec. Capital Corp*, 996 F. Supp. 1071, 1081 (D. Kan. 1998) ("Thus, the court adopts an 'intermediate' approach in analyzing the 'similarly situated' issue. To the extent the record has been developed, the court incorporates an analysis of the relevant factors found in post-discovery cases.").

The extent of discovery in this case is insufficient to warrant application of this intermediate standard, whatever that would involve.  In October 2010, before this motion was fully briefed, defendant requested that the Court defer a decision on conditional class certification pending extensive written and oral discovery that defendant proposed to take before

briefing the class certification issue.  ([Dkt#34], Defendant's Report of Rule 26(f) Planning

Meeting).  Plaintiff opposed extensive pre-certification discovery.  ([Dkt#35], Plaintiff's Report

of Rule 26(f) Planning Meeting).  The Court declined to order that such discovery take place

before the issue of conditional certification was decided.  Instead, the Court set a briefing

schedule on the instant motion.  Accordingly, the only discovery that has taken place is that

defendant has deposed the named plaintiff and two of the opt-in plaintiffs, and the parties have

exchanged Rule 26(a) initial disclosures.  (Pl's Reply Br., at 4, n.2).[6]  Defendant's submission of

23 affidavits of its own employees, none of whom have been deposed by plaintiff, does not count

as discovery for these purposes.

Therefore, this is not a case in which a heightened standard or more strict application of

the conditional certification framework is appropriate.  Although defendant relies heavily on

*Gromek  v. Big Lots, Inc.,* 2010 WL 5313792 (N.D. Ill. Dec. 17, 2010), in support of its

argument that a class should not be conditionally certified in this case, the situation in *Gromek*

was much different than here.  In *Gromek*, Judge Zagel stated that he was unwilling to

conditionally certify a class because a federal judge in Texas recently had presided over a trial

(following extensive discovery) in almost an identical case involving the same defendant and

concluded that the class certified in that case should be decertified.  2010 WL 5313792, at *3

(citing *Johnson, et al. v. Big Lots Stores*, 561 F. Supp. 2d 567, 568 (E.D. La. June 20, 2008).

Plaintiff correctly notes that Judge Zagel's decision in *Gromek*  "represents the culmination of

seven years of litigation [during which] two Courts conditionally certified collective actions

involving the misclassification of the [assistant store manager] position, and then decertified the

class after trial." (Pl's Reply Br., at 8, n. 4).  Defendant's reliance on *Gromek* at this stage of the

---

[6] During oral argument, counsel also indicated that some preliminary document exchanges have occurred.
It is unclear whether that was part of the initial disclosure process or in addition to it.  In any event,
discovery has not yet begun in earnest in this case.

certification process in this case only serves to make plaintiff's point that defendant's arguments against conditional certification at this juncture are premature.[7]

At the second stage, creating subclaims or subclasses potentially can address the issues raised by defendant.  In *Alvarez v. City of Chicago*, 605 F.3d 445 (7th Cir. 2010)*,* for example, the Seventh Circuit reversed the district court's dismissal of the case and approved a subclaim approach in order to address any dissimilarity between the potential class members.  605 F.3d at 449-450.  Similarly, in *Russell,* the court addressed the defendant's motion for decertification based on the need for individualized inquiries by creating subclasses. 721 F. Supp. 2d at 823 ("Because '[t]here are means to aid in making individualized determinations such as bifurcation for liability and damages, *designating subclasses*, and appointment of a special master,' certification is appropriate.") (emphasis added).  It is not uncommon for a district court to grant conditional class certification at stage one despite evidence of significant differences between potential class members because these differences can be solved at stage two through sub-classification.  *See Witteman*, 2010 WL 446033, at *2 ("[D]efendant fails to explain why any problematic dissimilarities among the different 'types' of outside plant engineers could not be solved through subclasses.") (citing *Carnegie v. Household International, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004)).

For all of these reasons, we find that plaintiff has made a factual showing that he and the potential opt-in plaintiffs are sufficiently similarly situated to meet the relatively lenient standard at this first stage of conditional certification.  Accordingly, we conditionally certify a class and

---

[7] Even if defendant's citation of *Gromek* here is intended to show the Court that plaintiffs in this case will meet the same fate as the plaintiffs in *Gromek* after discovery and trial, that argument also is premature at this stage of the proceedings.  This is similar to a defendant opposing a plaintiff's motion for summary judgment on the ground that although there are materially disputed facts, the Court should rest assured that those facts will be decided against the plaintiff at trial so the Court should grant summary judgment to the defendant preemptively and save the time, expense and inconvenience of the trial.

authorize that notice of a collective action pursuant to section 216(b) be sent to the following

class: All current and former salaried staffing recruiters, including both recruiters and senior

recruiters, [8] who have been employed at any time by the Staffing Solutions division of defendant

Maxim Healthcare Services Inc. (excluding California) during a three-year time period beginning

on a date to be determined by the Court pending supplemental briefing by the parties as

discussed below.  At this juncture, we find that the three-year class period, the outside limit of

any class that can be certified under section 216(b), is appropriate.  If the class period needs to be

adjusted at stage two, the Court can do so.

Plaintiff submitted a proposed schedule for class notice and an opt-in procedure with his

motion [Dkt.#32].  Defendant reserved the right to object to plaintiff's proposed notice, the opt-

in procedure, and the start date for the class period.  Plaintiff shall file its proposed class notice

and suggested notice procedure by April 28, 2011.  Defendant shall file any objection it has

regarding plaintiff's notice form and its content or notice procedures by May 9, 2011.  Plaintiff

shall file its response thereto by May 16, 2011.  The parties' submissions also shall address any

objections defendant has to providing plaintiff with name and address (including email) contact

information for the proposed putative class members and telephone contact information for any

proposed class members for people whose initial notices are returned because the addressee no

longer can be found at the given address.

## CONCLUSION

For all of the reasons discussed in the Court's Memorandum Opinion and Order,

plaintiff's motion for notice to potential class members is granted [Dkt.#32].  This matter is set

for hearing on plaintiff's proposed notice and notice procedures on May 20, 2011 at 11:00 a.m.

_____

[8] Based on evidence in the record, the court sees no reason to exclude senior recruiters from the class pending further discovery.  If, after discovery has taken place, there are significant differences between class members, this Court either can decertify the class or create subclasses.

If the briefing schedule set above or hearing date presents a problem for either party, they shall contact the Court's judicial assistant to adjust it.

It is so ordered.

_____
Jeffery T. Gilbert
United States Magistrate Judge

Dated:   April 21, 2011